FILED
2022 Jun-24 AM 08:29
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**NORTHWESTERN DIVISION**

| | | |
|---|---|---|
| **WESLEY BUTLER, JR.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | Civil Action Number |
| **v.** | ) | **3:21-cv-00486-AKK** |
| | ) | |
| **CONSTELLIUM,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION**

Wesley Butler, Jr., sues Constellium Muscle Shoals, LLC,[1] for discharging him through an allegedly discriminatory application of its workplace rules in violation of Title VII and 42 U.S.C. § 1981. *See* doc. 1. Both parties move for summary judgment, contending that a reasonable jury could not find in favor of Butler's claims and Constellium's defenses, respectively. *See* docs. 20; 24. The motions are fully briefed. Docs. 21; 26; 27; 29; 30. As explained herein, Constellium's motion is due to be granted because Butler has not raised a genuine dispute as to whether the reasons for his discharge were pretext for discrimination

[1] The complaint simply names "Constellium" as a defendant, *see* doc. 1, but the parties appear to agree that the relevant entity is Constellium Muscle Shoals, LLC, *see, e.g.*, docs. 24-1; 26. In any event, the court refers to the defendant as Constellium hereafter for ease of reference.

and because he does not otherwise cite sufficient circumstantial evidence of discrimination. As a result, Butler's motion is due to be denied as moot.[2]

**I.**

Under Federal Rule of Civil Procedure 56, "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." FED. R. CIV. P. 56(a). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* Rule 56 therefore "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The movant bears the initial burden of proving the absence of a genuine issue of material fact. *Id*. at 323. Then, the burden shifts to the nonmoving party to establish a "genuine issue for trial," *id*. at 324 (internal quotations omitted), meaning "that a reasonable jury could return a verdict for the nonmoving party," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[2] Butler also filed an unopposed motion for leave to submit a response brief after the deadline expired. Doc. 28. The court grants this motion and considers the response brief.

At summary judgment, the court construes the evidence and reasonable inferences arising from it in the light most favorable to the nonmovant. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Sconiers v. Lockhart*, 946 F.3d 1256, 1263 (11th Cir. 2020). "And if a reasonable jury could make more than one inference from the facts, and one of those permissible inferences creates a genuine issue of material fact, a court cannot grant summary judgment." *Sconiers*, 946 F.3d at 1263. Thus, "when competing narratives emerge on key events, courts are not at liberty to pick which side they think is more credible." *Id.* However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005). The filing of cross-motions for summary judgment does not affect these standards. *See Cole v. Owners Ins. Co.*, 326 F. Supp. 3d 1307, 1314 (N.D. Ala. 2018) (citing *United States v. Oakley*, 744 F.2d 1553, 1555–56 (11th Cir. 1984)).

**II.**

Constellium, previously Wise Alloys, LLC, operates an aluminum manufacturing plant in Muscle Shoals, Alabama. Doc. 22-1 at 2. Butler began working for Wise Alloys as a furnace operator in November 2010. Docs. 21 at 2; 27 at 2. During his employment, Wise Alloys maintained a collective bargaining agreement with the International Union of Operating Engineers Local 320, which represented the furnace operators. Docs. 21 at 4; 22-2 at 12; 24-6 at 1.

A.

Several of Constellium's employee guidance documents are at issue in this case. For workers in the collective bargaining unit like Butler, Constellium published Employee Conduct Rules that delineated workplace offenses and their corresponding penalties. *See* docs. 21 at 5; 27-5. According to the Conduct Rules, a first offense for "[u]nsafe acts or violation of safe work practices" or for "[f]ailure to report an accident or injury to Company personnel" would lead to a written warning, with a second offense leading to a five-day work suspension, and a third in discharge. Doc. 27-5. By contrast, the Conduct Rules provided that one Section "F" offense would lead to discharge. *See id.* "F violations" included "[f]alsification of any Company document or record" and "[d]isregard for Company Safety policies or procedures." *Id.*

Butler contends that these Conduct Rules, as written, provided automatic, mandatory penalties for the proscribed activities. However, according to John Blazer, Constellium's current Human Resources Director and former Labor Relations Manager, "[a]n employee violation of a Section F Conduct Rule," including for disregarding Constellium's safety policies or procedures (an F.12 violation), did not require automatic discharge. *See* doc. 22-1 at 5. Instead, Constellium "would consider the totality of the facts and circumstances to determine whether to discharge the employee." *Id.* Blazer says that these circumstances

included "the severity of the conduct, employees' knowledge of the applicable safety policy and the enforcement of that rule, and the employee's behavior after the incident and any mitigating and aggravating factors." *Id.* at 5–6. Thus, in Constellium's retelling, the Conduct Rules "simply inform[ed] its unionized workforce of conduct that justifie[d] discharge." Doc. 29 at 6.

Constellium's Standard Operating Procedures, or SOPs, are also relevant in this case. As a furnace operator, Butler had to submerge metals called "sows" in furnaces containing molten aluminum at temperatures upwards of 1,400 degrees Fahrenheit. Doc. 21 at 6. *See also* doc. 27 at 3. To guide this task, Constellium provided furnace operators with SOPs. *See* doc. 22-2 at 14. One SOP in place during Butler's employment, titled "Charging Sows," instructed furnace operators to preheat the sows to 300 degrees Fahrenheit,[3] confirm the sows reached this temperature using a "melt stick," have a supervisor mark the date "the prime reached the minimum temperature," follow the temperature requirements while "keep[ing] the batch [as] warm as possible," place the sows "on the charge chute and push [them] into the furnace with a charge well skimmer," and "[t]ake precaution not to over charge the furnace." Doc. 27-3 at 1. Otherwise, moisture left on the sows could lead to a chemical reaction in the furnace. *See* doc. 24-7 at 2.

[3] Other evidence suggests that the requisite temperature was 400 degrees Fahrenheit. *See, e.g.*, doc. 27-6 at 2. To the extent that this aspect is disputed, the exact temperature is immaterial to the issues raised in the motions.

B.

The incident that preceded Butler's discharge occurred in May 2020. According to Butler, a supervisor instructed Butler to place sows in a furnace but did not provide him with the requisite melt stick to check the sows' temperature, as per the typical procedure. Docs. 27 at 3; 22-2 at 55–56. Butler says that the supervisor instead told him the sows "were okay" and "had been in there for five days," meaning that Butler could charge the sows without confirming their temperature with a melt stick. Doc. 22-2 at 56. Butler claims that he consequently began to place the sows in the furnace one at a time and that the second sow led to a "splash" that caused material to eject from the furnace. Doc. 27 at 3. *See also* doc. 24-7 at 6. In Butler's view, he did not need to report this incident to his supervisors because it did not qualify as a serious enough event. *See* doc. 22-2 at 39.

According to Constellium, no supervisor gave Butler the go-ahead to charge the sows. Rather, Constellium says, Butler asked a production coordinator whose job involved "furnace chemistry" whether the sows were "ready," to which the coordinator replied that their "chemistry" (not their temperature) was "fine to place in the furnace." Doc. 21 at 10 (citing doc. 22-9). Constellium contends that after Butler placed a second sow in the furnace, an "explosion" occurred, causing molten aluminum to propel from the furnace. *Id.* at 10–11 (citing doc. 22-1). Constellium says that Butler then reversed his forklift to avoid the lava which, in turn, caused a

"skimmer tool" to fall because "it was not attached to the forklift as the SOP required." *Id.* at 11 (citing doc. 22-1). Constellium also says that Butler placed a third sow in the furnace after the explosion. *Id.* at 12. Butler does not dispute the contention about the forklift incident or that he placed the third sow in the furnace after the second one caused what he describes as a "splash."

Another employee reported the incident, and Constellium subsequently initiated an investigation. *Id.* To this end, supervisor Peter Hillman and coordinator Charlston Gholson provided statements, and manager Tommy Thornton created an incident summary based on video footage of the event.[4] Docs. 22-1 at 8; 22-11 at 15. Butler also provided a statement. Doc. 21 at 13. Ultimately, Blazer determined that Butler failed to (1) confirm the sows were preheated, (2) use a melt stick, (3) attach the skimmer tool to his forklift properly, (4) stop loading the sows into the furnace after the reaction; and (5) report the incident to his supervisors. Doc. 22-1 at 8. Based on this conduct, Blazer concluded that Butler had committed an "F.12 violation," for "[d]isregard for Company Safety policies or procedures," and consequently discharged him. *Id.*; doc. 24-5.

[4] Constellium supplies a copy of this footage, *see* doc. 23, though the footage is not necessary for the court to resolve the motions. The video shows a worker in a forklift inserting materials into a furnace. As the worker places material in the furnace, the furnace emits a bright purple light, and materials seem to propel onto the surrounding floor. The worker then reverses the forklift.

C.

Following his discharge, Butler filed a grievance under the collective bargaining agreement. Docs. 24-6 at 20–21; 24-7 at 2, 6. Ultimately, an arbitrator, after reviewing the evidence and testimony from Butler, the investigators, and the witnesses, concluded that Butler had committed the conduct in question and that Constellium "properly charged [Butler] with a violation of Section F of the Employee Conduct Rules." Doc. 24-7 at 2–4, 6, 12. Thus, the arbitrator found "just cause" for the discharge. *Id.* at 12. This lawsuit followed. Doc. 1.

**III.**

Butler, who is African American, contends that Constellium discriminatorily applied its Conduct Rules in order to discharge him, despite giving less severe penalties to white coworkers who committed similar conduct violations. *See* doc. 1. For its part, Constellium maintains that these white coworkers do not count as comparators and that Butler fails to rebut the nondiscriminatory reasons for his discharge. *See* doc. 21. Constellium also contends that Butler previously falsified aspects of his job application, a purportedly dischargeable offense that Constellium says should limit the damages Butler can recover, if any. *See id.*

In response, Butler argues that he raises genuine disputes about his comparators and Constellium's articulated reasons for his discharge, and he also claims that he presents a mosaic of circumstantial evidence of discrimination

regarding Constellium's application of its Conduct Rules. *See* doc. 27. Butler also asserts that whether he falsified his job application and whether Constellium would have independently discharged him for that alleged conduct are issues for a jury, if necessary to resolve at all. *Id.* Butler separately moves for summary judgment on several of Constellium's affirmative defenses.[5] Doc. 24-1.

The court turns first to Constellium's motion, Butler's *prima facie* case, and the alleged circumstantial evidence of intentional discrimination. Finding that Constellium's motion is due to be granted, the court does not address the issue of damages, nor does it reach the merits of Butler's motion.

A.

Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating against an employee with respect to the "terms, conditions, or privileges of employment" because of the employee's race. 42 U.S.C. § 2000e-2(a)(1). Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." 42 U.S.C. § 1981(a). In this case, "the elements of the two causes of action" and their

[5] Specifically, Butler moves for summary judgment on Constellium's defenses of claim preclusion, issue preclusion, res judicata, collateral estoppel, and failure to mitigate. Doc. 24-1. He also seeks judgment on Constellium's timeliness and waiver defenses, *id.*, but Constellium has since dismissed those defenses, doc. 26.

corresponding analyses "are the same." *See Richardson v. Leeds Police Dep't*, 71 F.3d 801, 805 (11th Cir. 1995); *Short v. Mando Am. Corp.*, 805 F. Supp. 2d 1246, 1268 (M.D. Ala. 2011). *See also Lewis v. City of Union City, Ga.*, 918 F.3d 1213, 1217, 1220 n.5 (11th Cir. 2019).

Faced with Constellium's motion, Butler "must make a sufficient factual showing to permit a reasonable jury to rule in [his] favor" and "can do so in a variety of ways, one of which is by navigating the now-familiar three-part burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *See Lewis*, 918 F.3d at 1217 (internal citation partially omitted). Butler can also defeat Constellium's motion by "demonstrat[ing] a 'convincing mosaic' of circumstantial evidence that warrants an inference of intentional discrimination."[6] *Id.* at 1220 n.6.

1.

To establish a *prima facie* case of discrimination under *McDonnell Douglas*, Butler must show that (1) he belongs to a protected class, (2) Constellium subjected him to an adverse employment action, (3) he was qualified to perform the job in question, and (4) Constellium treated "similarly situated" employees outside of his protected class more favorably. *See id.* at 1220–21. If Butler succeeds, "the

[6] Butler could also present direct evidence of discrimination, *see Lewis*, 918 F.3d at 1220 n.6, but he does not claim to do so.

burden shifts to [Constellium] to articulate a legitimate, nondiscriminatory reason for its actions." *See id.* at 1221. Should Constellium do so, the burden reverts to Butler to "demonstrate that [Constellium's] proffered reason was merely a pretext for unlawful discrimination." *See id.*

a.

Butler has shown, and Constellium does not dispute, that he is in a protected class, Constellium discharged him from his role as a furnace operator, and he had the qualifications to work as a furnace operator. Thus, his *prima facie* case rests on whether he can establish that Constellium treated "similarly situated" employees who are not African American more favorably. *See* doc. 27 at 15; *Lewis*, 918 F.3d at 1220–21. To do so, Butler must "show that [he] and [his] comparators are 'similarly situated in all material respects.'" *See Lewis*, 918 F.3d at 1226.

To be specific, Butler need not prove that he and his cited comparators "are identical save for their race," "[n]or is it necessary for [him] to prove purely formal similarities—*e.g.*, that [he] and [his] comparators had precisely the same title." *See id.* at 1227. Rather, generally speaking, a similarly situated comparator will have engaged in the same basic conduct; been subject to the same policy, guideline, or rule; been under the jurisdiction of the same supervisor; and shared a similar employment or disciplinary history. *See id.* at 1227–28. These parameters are meant to "leave[] employers the necessary breathing space to make appropriate

business judgments" to, for instance, accord different treatment to workers who have engaged in different conduct. *Id.* at 1228.

Butler cites several white employees whom he says engaged in similar conduct or purportedly violated the same Conduct Rule(s), and yet Constellium treated them more favorably. Butler first refers to Robert Bays, "a white employee [who] violated a rule under Section F and . . . received a last chance agreement" instead of a discharge after "charg[ing] material into a furnace without using a chute pan, causing metal to splash out of the furnace." Doc. 27 at 4 (citing doc. 22-11). Butler also says that Constellium accused Bays of "failing to meet production standards," "engaging in a work slow down," and "falsifying company documents," the latter two of which count as "F violations." *Id.* at 4–5. However, according to Butler, in lieu of discharge, Constellium opted to discuss the violations with Bays. *See id.* Butler also cites as comparators Connor Mansell, David Freeman, and Nathaniel Williamson, white employees who allegedly committed Section F.12 safety violations but received last chance agreements in lieu of discharges. *Id.* at 6.

Constellium responds that certain circumstances distinguish these employees from Butler. *See* doc. 29 at 3–4. For one, Blazer avers that Constellium initially discharged Bays for failing to use the charge chute, which caused a "splash" (but no explosion), and that Blazer returned Bays to work after concluding as part of the post-discharge grievance process that the safety procedures Bays should have used

"[were] not well understood by the employees" and that Bays had tried to alert his supervisors about the incident immediately. Doc. 22-1 at 12–13.[7] Constellium also asserts that Butler "mischaracterizes" the facts surrounding Bays' other incidents, including that it made no finding that Bays had engaged in a work slowdown. *Id.* at 4. Rather, Constellium "simply warned [Bays] after his production dropped that *if* he was engaging in a work slowdown or falsified company documents it would lead to 'immediate' termination." *Id.* (emphasis in original). Further, Blazer avers that he converted Mansell's, Freeman's, and Williamson's discharges into last chance agreements after learning that (1) other employees remained confused about or did not always follow the safety protocols at issue; (2) Mansell, Freeman, and Williamson acknowledged their mistakes; (3) they each had just one safety violation; and (4) they did not repeat the behavior at issue. Doc. 22-1 at 13–15.

These distinctions are well taken. But bound up within them is the related—and disputed—assertion that notwithstanding the Conduct Rules, which Butler says provided automatic discharge for certain first offenses, Constellium exercised its discretion to retain individuals based on the circumstances of their incidents. Indeed, Constellium explicitly maintains that its Conduct Rules have never

---

[7] In short, according to Blazer, Bays "acknowledged his mistake, only had one safety policy violation, . . . did not repeat the same dangerous behavior that caused the mistake. . . . [and] did not fail to timely report the incident." Doc. 22-1 at 13.

*mandated* discharge for Section F violations and that "Constellium has always disciplined employees based on the facts and circumstances." Doc. 29 at 2–3. In support, Constellium cites Blazer's testimony that his disciplinary actions "depend[ed] on the circumstances," including the severity of the alleged offense and the offending employee's disciplinary history. *See* doc. 22-8 at 6–7.

Butler basically responds in twofold. First, he disputes that the white employees' alleged violations and situations differed materially from his own, asserting, based on secondhand information from a coworker, that Bays, for example, waited for 30 minutes before reporting his violation and only did so when supervisors approached him in the break room. *See* doc. 27 at 5 (citing doc. 22-2). The court questions Butler's claims on this point. Constellium has provided evidence that Butler's alleged comparators, including Bays, reported the incidents in question and that Butler did not report his at all, *see* doc. 22-1 at 13–15, and Butler does not offer evidence to raise a genuine dispute on these facts.

More critically, though, Butler also maintains that Constellium's Conduct Rules plainly do not mention lesser penalties or mitigating circumstances and therefore do not permit discretion. Doc. 27 at 16–17 (citing doc. 27-5). Butler says that Constellium therefore sidestepped its "strict, clear-cut policy" for white employees. *Id.* at 17. The bottom line, he says, is that Constellium's distinctions are immaterial and prohibited by Constellium's own policy. *Id.* at 16–17. And, he

says, if Constellium had chosen to evaluate the circumstances in his incident, such as that a supervisor directed him to charge the sows without a melt stick,[8] Constellium would have applied a lesser penalty. *Id.*

Whether Butler's supervisor instructed him to insert the sows, Constellium routinely exercised discretion under the Conduct Rules, or Constellium inaccurately weighed the mitigating factors in Butler's case implicate factual disputes inappropriate for resolution at this juncture, if at all.[9] Construing the evidence and reasonable inferences arising from it in Butler's favor, the court will assume that Constellium bucked procedure by giving lesser penalties to certain employees notwithstanding its Conduct Rules. Doing so, however, does not lead to a denial of Constellium's motion. Relevant here, Constellium cites evidence showing that Blazer converted discharges into last chance agreements for several African American employees after they committed safety violations, *see* docs. 22-1 at 13–15; 29 at 5–6, suggesting that Constellium could and would return employees to work, regardless of their race, based on the circumstances. This may undermine

---

[8] This point does not help Butler. Constellium indeed talked to the supervisor in question, who, like Butler, is African American. The supervisor denied Butler's contention and maintained that he addressed a matter related to the "chemistry" only, rather than the temperature of the sows. Doc. 21 at 10 (citing doc. 22-9).

[9] The court will not weigh in on the merits or accuracy of Constellium's judgment, including whether Constellium should use discretion to convert employees' discharges into last chance agreements and, if so, what circumstances should warrant this change. *See Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010). Rather, as discussed later, the court's role is limited to assessing if Butler raises a genuine dispute about whether Constellium discharged him because of discrimination. *See id.*

Butler's assertion that the white employees who also received last chance agreements in lieu of discharges would constitute similarly situated comparators had Constellium not applied its discretion discriminatorily. And Butler does not respond to Constellium's contention that "[he] cannot cherry pick one comparator while ignoring all the others, including the Black employees treated better (three received LCAs) and the White employees treated worse (eight terminated for one F.12 violation)." *See* doc. 29 at 9–10.

All in all, this might rule out Butler's alleged comparators. *See Davis v. Dunn Constr. Co.*, 872 F. Supp. 2d 1291, 1311 (N.D. Ala. 2012) (noting, as relevant to the plaintiff's alleged comparators, that the fact that some employees within the plaintiff's protected class received higher pay than him "call[ed] [his] allegations of disparate pay into doubt"). However, Constellium does not cite binding case law on this issue, and in the court's assessment, genuine disputes remain as to the circumstances, roles, and conduct of the African American comparators whom Constellium claims Butler ignores. Thus, for purposes of Constellium's motion, the court concludes that Butler cites similarly situated comparators in the form of the white employees whom Constellium did not discharge for safety violations and that Butler has established his *prima facie* case. The court addresses lingering questions about whether discrimination led Constellium to discharge Butler instead of giving him a lesser penalty in the pretext analysis. *See infra* § III.A.1.c.

b.

The burden thus shifts to Constellium to articulate a non-discriminatory reason for Butler's discharge. *See Lewis*, 918 F.3d at 1221. "[Constellium] need not persuade the court that it was actually motivated by the proffered reason, but need only present evidence raising a genuine issue of fact as to whether it discriminated against [Butler]." *See Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1265 (11th Cir. 2010). Constellium says that Butler's actions violated several SOPs and constituted a Section F.12 offense, justifying his discharge. Doc. 21 at 16. Constellium also cites the arbitrator's decision, which found just cause to discharge Butler, as evidence of the legitimacy of Constellium's reason. *See id.* at 22. While the court will not strictly defer to the arbitrator's decision and accept Constellium's reasons as its true motivation, Constellium has met its burden of proffering a non-discriminatory reason for Butler's discharge. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506–07 (1993).

c.

The burden reverts to Butler to rebut Constellium's reasons as a pretextual cover for discrimination. *See Lewis*, 918 F.3d at 1221. Butler may do so "by offering evidence that [Constellium] more likely than not acted with a discriminatory motive, or by showing that its proffered reasons are not credible, unless the record conclusively shows that the real motive was a non-proffered reason that is non-

discriminatory." *See Alvarez*, 610 F.3d at 1265. But Butler cannot "recast" Constellium's reasons or substitute his "business judgment" for Constellium's. *See id.* "Provided that the proffered reason is one that might motivate a reasonable employer, [Butler] must meet that reason head on and rebut it [and] cannot succeed by simply quarreling with the wisdom of that reason." *See id.* at 1265–66 (quoting *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 1991)). Because Constellium articulates multiple reasons for the discharge, Butler must raise a genuine dispute as to the truth of each one. *See Combs v. Plantation Patterns*, 106 F.3d 1519, 1529 (11th Cir. 1997).

An employee's violation of an employer's rules of conduct or safety policies could reasonably motivate the employee's discharge. Thus, "[t]he question is whether [Constellium] [was] dissatisfied with [Butler]" for this "non-discriminatory reason[], even if mistakenly or unfairly so," or instead used Butler's alleged conduct merely as a "cover" to discriminate against him based on his race. *See Alvarez*, 610 F.3d at 1265–66. Put another way, the inquiry rests on whether Constellium believed Butler committed certain misconduct and, if yes, whether that belief led it to discharge him, regardless of whether Butler actually engaged in the misconduct. *See id.*; *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991).

Although Butler agrees that his conduct led to at least a "splash" in the furnace, he takes issue with whether he caused an explosion or otherwise violated

Constellium's policies and procedures in the manner it asserts. *See* doc. 27 at 3. But denying that he caused an explosion overlooks his other conduct: deciding to charge another sow after the "splash" from the second sow, which led him to reverse the forklift, and dropping the skimmer tool in the process.[10] Constellium cited these additional infractions to support the discharge, and Butler does not address these reasons in his responses. Moreover, disagreeing with the characterization of the reaction or explosion, by itself, does not suffice. The relevant inquiry is whether Butler casts sufficient doubt about whether Constellium *believed* Butler committed these violations and whether *that belief* caused Constellium to discharge him. *See Alvarez*, 610 F.3d at 1265–66. In making this determination, the court will "not sit as a super-personnel department that reexamines [Constellium's] business decisions. . . . [Its] inquiry is limited to whether [Constellium] gave an honest explanation of its behavior." *See Elrod*, 939 F.2d at 1470. And "if the employer fired an employee because it honestly believed that the employee had violated a company policy, even if it was mistaken in such belief, the discharge is not 'because of race' . . . ." *Smith v. Papp Clinic, P.A.*, 808 F.2d 1449, 1452–53 (11th Cir. 1987).

Although Butler disputes what Constellium's safety protocols required in his particular situation and the circumstances surrounding his alleged offenses, he does

[10] While Butler disagrees that an explosion occurred, even in his retelling, the "splash" was severe enough for him to react and reverse the forklift.

not seem to contest that Constellium *believed* he violated those protocols. Rather, Butler argues that this belief could not have truly caused his discharge because Constellium "deviated from its own written policy" to advantage white employees in similar situations, and so pretext "is an issue for a jury." Doc. 27 at 20. On this point, Butler reasserts that the Conduct Rules, by their own terms, did not provide Constellium discretion to give lesser penalties for certain offenses and that Constellium impermissibly and inconsistently applied its discretion to benefit white employees but not African American employees like Butler.[11] *See id.* at 19–20.

A company's deviations from standard procedures can certainly indicate pretext. *See Hulbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1299 (11th Cir. 2006) (taking as evidence of pretext that an employer did not issue the plaintiff's separation notice until 12 days after his discharge, although the employer "usually prepare[d]" such notices "within a day or two of termination"). And construing the evidence and inferences arising from it in Butler's favor, the court assumes that in giving some employees lesser penalties in lieu of discharges for Section F offenses, Constellium deviated from its standard practice under the Conduct Rules.[12] However, the court must return to Constellium's evidence that, unlike the

---

[11] As Butler does here, a plaintiff may rely on evidence she or he used to support her or his *prima facie* case also to show pretext. *Chapman*, 229 F.3d at 1024.

[12] This assumption, of course, ignores as disputed Constellium's assertion that the Conduct Rules "simply inform[ed] its unionized workforce of conduct that justifie[d] discharge," doc. 29 at 6, and its evidence that it typically considered the totality of the circumstances surrounding an offense to

employees Butler cites, Butler committed multiple infractions and that it provided last chance agreements to several African American employees who purportedly committed safety violations instead of discharging them. *See* doc. 22-1 at 13–15. This evidence, which Butler does not challenge, suggests that factors outside of racial discrimination factored into Constellium's penalty decisions and cuts against Butler's claim that Constellium chose to deviate from its Conduct Rules and discharge him because of his race.

That Constellium inconsistently gave last chance agreements to both African American employees and white employees instead of discharging them—ignoring, at this stage, that Constellium allegedly used some rationale to do so—does not alone show pretext. *Cf. Alvarez*, 610 F.3d at 1267 ("The fact that each previous controller was fired under similar circumstances is strong evidence that however unattainable [the supervisor's] standards may have been, she applied them indiscriminately. . . ."). And Butler does not proffer other evidence to illustrate that Constellium's articulated reasons for his discharge were untrue—in fact, he does not address two of them—and that racial discrimination was the real reason. As a result, he does not raise a genuine dispute with regard to whether racial animus factored in his discharge, and his Title VII and § 1981 claims cannot proceed under *McDonnell Douglas*. *See id.* at 1267–68.

---

determine whether it warranted discharge, *see, e.g.*, doc. 22-1 at 5–6.

2.

As an alternative to the *McDonnell Douglas* framework, Butler can defeat Constellium's motion by presenting a "convincing mosaic" of circumstantial evidence of intentional discrimination. *See Lewis*, 918 F.3d at 1220 n.6 (citing *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011)). Under this standard, Butler can but need not proffer comparators. *See id.* at 1185. Instead, Butler may defeat Constellium's motion by citing evidence that

> demonstrates, among other things, (1) suspicious timing, ambiguous statements . . . , and other bits and pieces from which an inference of discriminatory intent might be drawn, (2) systematically better treatment of similarly situated employees, and (3) that [Constellium's] justification is pretextual.

*See id.* (internal quotation marks omitted).

Butler alleges that the following circumstantial evidence amounts to a convincing mosaic of discrimination:

- that Constellium "promulgated a clear, unambiguous policy requiring termination when employees commit certain offenses and did not reserve for itself the right to deviate," but "routinely exercised discretion not found in the policy" for white employees like Bays, Mansell, Freeman, and Williamson;
- that "when Bays's incident demonstrated that the entire team needed retraining, [Constellium] took his word that others were not following the same procedure, provided him a last chance agreement, and assigned him to train the rest of his employees";
- that when Constellium "concluded that the procedure Butler allegedly did not follow needed revision, it still terminated him,"

and that two weeks later, it "trained the E13 cast house on the procedure it alleged that Butler had violated";

- that Butler "never received training on the procedure [Constellium] presented to the EEOC as evidence that he had violated the SOPs"; and
- that Butler, who had a "ten-year history of following the rules," followed Constellium's then-existing policy and relied on his supervisor's direction to insert the sows at issue.

Doc. 27 at 13–15. On the one hand, this evidence suggests that Constellium could better publicize rules of conduct and safety that delineate clearer and more consistent training and disciplinary procedures. On the other hand, though, this evidence could also establish discrepancies in Constellium's disciplinary process "from which an inference of discriminatory intent might be drawn." *See Lewis*, 918 F.3d at 1185. For the purposes of Constellium's motion, the court presumes the latter.

However, Butler does not address Constellium's evidence that it previously offered last chance agreements to African American employees and white employees in lieu of discharges and, conversely, discharged African American employees and white employees for safety violations instead of lighter penalties, *see* docs. 22-1 at 13–15; 29 at 6, or that it did not offer Butler a similar opportunity because he committed multiple infractions, including placing another sow into the furnace right after the explosion—or, in Butler's view, splash—he had just caused. This casts doubt on whether Constellium gave "systematically better treatment" to similar employees who are not African American and whether Constellium

discharged Butler because of his race. *See Lewis*, 918 F.3d at 1185. And unlike the plaintiff in *Lewis*, for example, Butler does not supply evidence that Constellium did not believe the articulated reasons for his discharge, that Constellium summarily discharged him without any inquiry, or that his supervisors made any prejudicial or derogatory comments. *See id.* at 1186–88.

As a result, Butler does not aggregate a convincing mosaic of evidence from which the court can infer that Constellium discriminatorily discharged him. In conjunction with Butler's failure to rebut Constellium's reasons for his discharge as pretextual under *McDonnell Douglas*, this requires summary judgment on Butler's Title VII and § 1981 claims.

B.

Having found Constellium's motion meritorious, the court will not address the merits of Butler's cross-motion for summary judgment on several of Constellium's affirmative defenses. Instead, the court will deny the motion as moot.

**IV.**

In closing, the court acknowledges that Butler views the surrounding circumstances of his discharge as unfair. However, the court cannot "second-guess the wisdom of [Constellium's] business decisions—indeed the wisdom of them is irrelevant—as long as those decisions were not made with a discriminatory motive."

*See Alvarez*, 610 F.3d at 1266. And here, Constellium articulated multiple infractions Butler committed as reasons for the discharge, two of which Butler does not address. Nor has Butler rebutted Constellium's contention that the deviations he cites also benefitted African American employees and that Constellium has discharged more white employees than African American employees for Section F violations. Therefore, because Butler does not raise a genuine dispute as to whether Constellium discharged him because of his race, summary judgment is required, and his motion for summary judgment on Constellium's defenses is moot. A separate order follows.

**DONE** the 24th day of June, 2022.

**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE